**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FREMAK INDUSTRIES, INC.,<br><br>    Debtor. | Chapter 11 Case No.<br><br>15-11740 (___) |

**DECLARATION OF LEON GOLDENBERG**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

State of New York    )
                                    ss:
County of New York  )

    I, Leon Goldenberg, make this declaration under 28 U.S.C. § 1746:

    1.    I am the President of Fremak Industries, Inc. (the "**Debtor**"). I have served in this capacity since the Debtor's founding over 30 years ago. I have been in the steel business for nearly 40 years and serve as a senior board member and Vice President of the American Institute for International Steel.

    2.    On July 1, 2015 (the "**Petition Date**"), the Debtor commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

    3.    I am knowledgeable and familiar with the business and financial affairs of the Debtor. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and other parties in interest of the circumstances that compelled the commencement of this chapter 11 case and in support of (a) the Debtor's chapter 11 petition and (b) the motions and applications that the Debtor has filed with the Court. I am authorized to submit this Declaration on behalf of the Debtor.

**I.     The Debtor's Business.**

1. The Debtor is engaged in the purchase, sale, and distribution of tubular products that are used in the drilling and transportation of oil and natural gas. The Debtor purchases tubular products from manufacturers overseas and resells them to third parties in North America. The Debtor never takes physical possession of the products. Instead, the Debtor has the manufacturer ship the products directly to the Debtor's customers. The Debtor typically posts letters of credit to secure the purchase orders of products from its overseas manufacturers.

2. The Debtor's purchases tubular product consists mainly of steel coupling stock and casings (a casing is a steel tube). A steel coupling is a piece of coupling stock that has been threaded in order to connect two pieces of casing together. Couplings enable several pieces of casing to be strung together, one into each end of the coupling. Coupling stock is a type of steel pipe manufactured to be cut down into smaller pieces of varying lengths, and processed into couplings.

5. Prior to the relatively recent issues with ISMT (defined below), the Debtor was an active broker in the industry. The Debtor's business was profitable and relationships with various customers were growing. After the well failures caused by the substandard steel sold by ISMT and the resulting litigation, the Debtor was unable to renew their bank lines, which were

2

critical to the Debtor's ability to operate. In addition, just before the Petition Date, ISMT froze the Debtor's bank accounts at Citibank N.A. in an attempt to execute the ISMT Award (defined below).

## II.     Events Leading to the Chapter 11 Case.

3.      Prepetition, the Debtor had a business relationship with ISMT Limited ("**ISMT**"), a manufacturer licensed by the American Petroleum Institute ("**API**"). The Debtor purchased prime seamless coupling stock from ISMT for sale to the Debtor's customers. ISMT was responsible for milling and finishing the prime seamless coupling stock, purportedly in an API-certified mill, which could manufacture products for the oil and gas industry in compliance with the strict standards of the American Petroleum Institute API 5 CT.

4.      In reliance upon ISMT's credentials as an API-certified mill, the Debtor, as a distributor, purchased steel from ISMT for its American customers, including Joy Pipe USA, L.P. ("**Joy Pipe**") based in Houston, Texas. The Debtor, as well as its customers, relied on API Mill Test Certificates supplied by the mill certifying the properties of the tubular steel products being shipped. The Mill Test Certificates were produced by ISMT and provided the chemical properties (specified under API 5 CT) of the steel produced by ISMT to ensure that the steel was of a sufficient grade and quality to be used under extreme forces and conditions in oil and gas drilling operations.

5.      Further, API 5 CT standards provided that the Debtor and Joy Pipe had a right to rely on the Mill Test Certificates prepared and produced by ISMT. Because parties downstream from the mill have a right to rely on ISMT's Mill Test Certificates, customers, distributors, and other downstream suppliers are not required to dispute the representations of the mill and run their own tests on the steel milled by ISMT and purported to be covered by the Mill Test

3

Certificate. It was based on these business parameters and API standards that the Debtor purchased steel from ISMT.

6. On July 30, 2010, the Debtor and ISMT entered into Purchase Contract No. 460235 for the purchase and sale of new prime seamless coupling stock. On January 3, 2012, the Debtor and ISMT entered into Purchase Contract No. 460309 for the purchase and sale of new prime seamless coupling stock. On April 23, 2012, the Debtor and ISMT entered into Purchase Contract No. 460342 for the purchase and sale of new prime seamless coupling stock (collectively, the "**Purchase Contracts**").

7. Under the Purchase Contracts identified above, ISMT contracted to manufacture and sell to the Debtor new prime seamless coupling stock that met the grade of API 5CT P-110 ("**P-110**").

8. In approximately August 2012, the Debtor became aware of the failures and potential issues associated with the products purchased from ISMT. This has led to several overlapping litigation matters between the Debtor, ISMT, and various third parties.

9. Specifically, the Debtor learned that some of the seamless coupling stock that ISMT manufactured failed to meet the required quality and grade, and in fact was of a much lower grade, which made the steel soft and unsuitable for couplings used in an oil well production. ISMT's products also had various technical issues, relating to the outer diameter, mis-stenciling of pipes, and other imperfections appearing in the coupling stock.

10. Due to ISMT's failure to manufacture the steel to P-110 grade, the steel had a very low yield strength allegedly causing catastrophic failures in two separate oil well incidents in Alberta, Canada. The first well failure occurred in a well owned by Vermilion Energy Trust.

The second well failure occurred in a well owned by NuVista Energy Limited. The Debtor asserts that both well failures are attributed to soft steel provided by ISMT.

        A.      <u>The Houston Litigation</u>

11.    On July 24, 2013, Joy Pipe filed suit against the Debtor alleging that the ISMT steel that was distributed to Joy Pipe was sub P-110 standard (the "**Houston Litigation**"). The Houston litigation is styled: *Joy Pipe USA, L.P. vs. Fremak Industries, Inc. and ISMT Limited*, Civil Action No. 13-2153, and is pending in the United States District Court for the Southern District of Texas (Houston Division). Specifically, Joy Pipe has asserted causes of action against the Debtor for breach of contract, breach of the implied warranties of merchantability and fitness for a particular purpose under the Texas Business & Commerce Code §2.314 and §2.315, breach of express warranty, strict products liability, negligence, and negligent misrepresentation.

12.    On August 1, 2013, the Debtor asserted cross claims against ISMT for statutory indemnity, breach of contract, negligence, and contribution. The Debtor believes it is entitled to be indemnified for any and all of Joy Pipe's damages. Among other things, the Debtor is entitled to statutory indemnity under Texas Civil Practices & Remedies Code Chapter 82 *et seq*. The Debtor is an innocent retailer of the defective ISMT steel and ISMT should be required to indemnify the Debtor for any and all damages claimed by Joy Pipe. The court in the Houston Litigation has stayed the Debtor's cross claims and ordered them to be litigated before the International Court of Arbitration.

13.    The Houston Litigation is continuing and discovery is coming to a close. Discovery must be completed by August 14, 2015 and will likely end with the deposition of the Debtor's President, Leon Goldenberg, on July 15, 2015. A Joint Pretrial Order is due by July 31,

2015 and trial is currently scheduled in the Houston Litigation for the September-October trial term (no definitive trial date exists at this time).

### B.   The ISMT Arbitration

14.   On August 2, 2013, ISMT commenced arbitration in the International Chamber of Commerce (the "**ICC**"), asserting claims against the Debtor for allegedly breaching certain purchase orders with IMST (the "**ISMT Arbitration**").

15.   On January 26, 2015, the arbitrator in the ISMT Arbitration awarded ISMT $2,705,093.20, plus interest at 5.33% compounded annually to date (as of June 18, 2015, approximately $419,394.15) plus attorneys-fees and costs of arbitration (as of June 18, 2015, approximately $899,105.23), for a total of $4,023,394.15 (the "**ISMT Award**").

16.   ISMT moved to the confirm the ISMT Award in the United States District Court in the Southern District of New York, which confirmation was granted on June 18, 2015 (the "**Confirmation**").  The Debtor was provided with thirty (30) days to appeal the Confirmation.

17.   On June 30, 2015, the Debtor appealed the Confirmation by filing the Notice of Appeal (the "**ISMT Award Appeal**").

### C.   The Fremak Arbitration

18.   As directed by the court in the Houston Litigation, on January 15, 2015, Fremak filed for arbitration in the International Court of Arbitration seeking, among other things, $8,000,000 in damages from ISMT for damages to the Debtor's business (the "**Fremak Arbitration**").  The Debtor is also seeking a declaration that to the extent that any party can prove that ISMT has supplied sub grade steel to any customer of the Debtor which proves to be below P-110 grade, then ISMT owes the Debtor complete indemnity from any claims.  The

6

Arbitration is currently set for trial in March of 2016. Discovery in the arbitration is due to begin on July 31, 2015.

### D.    The Insurance Policy

19.    The Debtor is insured under a Commercial General Liability Policy, No. 91 UEN IT7775 and an Umbrella Liability Policy, No. 61 RHU IT4989 (the "**Policy**") issued by Hartford Fire Insurance Company (the "**Insurer**"). The General Liability Policy provides up to $1,000,000 in coverage per occurrence while the Umbrella Policy provides up to $15 million in coverage per occurrence.

20.    The Insurer has reserved its rights with respect to coverage but has agreed to advance the Debtor's litigation costs with respect to the Houston Litigation and the Fremak Arbitration.

## III.    The Objectives of this Chapter 11 Case.

21.    The Debtor has filed this chapter 11 case to ensure a fair and equitable distribution to its creditors and a continuation of the Debtor's business post-reorganization. The Debtor seeks to continue the Houston Litigation and the Fremak Arbitration to a final resolution to ensure that all claims of and against the Debtor are liquidated. Once liquidated, the Debtor will be in a position to make a distribution to all creditors. Currently, ISMT is seeking to execute on its arbitration award from the ISMT Arbitration, which would harm the recovery for all creditors by potentially derailing the Debtor's opportunity to liquidate its own claims.

22.    The Debtor further seeks to protect its business during this difficult time. As noted, the Debtor and its management have been in this business for decades. The Debtor's name and reputation until the Houston Litigation and the Fremak Arbitration have been beyond reproach. Through this chapter 11 case, the Debtor seeks to maintain its standing and reputation,

7

while providing parties it does business with a going-concern entity that they can do business with in the future.

23.     The Debtor plans to use the chapter 11 case to liquidate all claims of and against the Debtor.  Once those claims are resolved, the Debtor will propose a plan of reorganization with distributions to creditors as required under the Bankruptcy Code.

## IV. Information Required by Local Rule 1007-2.

24.     In accordance with Local Rule 1007-2(a)(2), to the best of my knowledge, information, and belief, no case has been previously commenced against the Debtor under chapters 7, 11, or 13 of the Bankruptcy Code.

25.     In accordance with Local Rule 1007-2(a)(3), to the best of my knowledge, information, and belief, no creditors' committee was organized before the Petition Date.

26.     In accordance with Local Rules 1007-2(a)(4) and (5), to the best of my knowledge, information, and belief, the Debtor has no secured creditors and the unsecured creditors excluding insiders are:

| **Name** | **Telephone** | **Name** | **Telephone** |
|---|---|---|---|
| Kurmax Steel Trading<br>259 Round Hill Road<br><br>Roslyn Heights, NY 11577 | (917) 885-0914 | ISMT Limited<br>c/o Lazare Potter & Giacovas, LLP<br>875 Third Avenue, 28th Floor<br>New York, NY 10022 | (212) 758-9300 |
| HJA Realty<br>150 East 58th Street, Suite 2001<br>New York, NY 10155 | (212) 230-2600 | Joy Pipe USA, LP<br>c/o Litchfield Cavo, LLP<br>One Riverway, Suite 1000<br>Houston, TX 77056 | (713) 418-2017 |
| Nuvista Energy LTD.<br><br>c/o Burnet, Duckworth & Palmer LLP | (403) 260-0245 | Wooley & Associates, Inc.<br><br>3100 S. Gessner, Suite 325, Houston, Texas 77063 | (713) 781-8974 |

2400, 525-8 Avenue SW
Calgary, Alberta T2P 1G1

27. In accordance with Local Rule 1007-2(a)(6), to the best of my knowledge, information, and belief, the following is a summary of the Debtor's assets and liabilities. The Debtor's books and records reflect that the Debtor has in assets:

Cash:        $8,000 (subject to lien of ISMT)

Receivables:    $671,000

28. The Debtor's books and records further reflect that the Debtor has in liabilities the amounts described herein.

29. In accordance with Local Rule 1007-2(a)(7), to the best of my knowledge, information, and belief, the Debtor is not a publicly held company.

30. In accordance with Local Rule 1007-2(a)(8), to the best of my knowledge, information, and belief, IMST has garnished the Debtor's bank account located at Chase Bank and has taken all funds within that account. IMST's name, address, and telephone number are listed above.

31. In accordance with Local Rule 1007-2(a)(9), to the best of my knowledge, information, and belief, the Debtor leases its premises at 150 East 58th Street, New York, New York 10155.

32. In accordance with Local Rule 1007-2(a)(10), to the best of my knowledge, information, and belief, the Debtor's assets and books and records are located at 150 East 58th Street, New York, New York 10155.

33. In accordance with Local Rule 1007-2(a)(11), to the best of my knowledge, information, and belief the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property, and any judgment or seizure, is detailed above.

34. In accordance with Local Rule 1007-2(a)(12), the Debtor is managed by Leon Goldenberg, its President.

35. In accordance with Local Rule 1007-2(b)(1), the Debtor's monthly payroll consists of its one administrative employee at $3,000.

36. In accordance with Local Rule 1007-2(b)(2), the Debtor anticipates paying no compensation to its sole officer, Leon Goldenberg during the thirty-day period following the Petition Date.

37. In accordance with Local Rule 1007-2(b)(3), the Debtor does not estimate any cash receipts or disbursements, net cash gains or losses, or any receivables expected to accrue but remain unpaid during the first thirty-day period following the Petition Date.

V. **First Day Motions.**

A. *Motion to Modify the Stay to Continue Litigations and Permit Advancement of Litigation Costs*.

38. In this motion, the Debtor requests that this Court enter an order modifying the automatic stay, to the extent necessary, to allow the Debtor to continue the Fremak Arbitration, the ISMT Award Appeal, and the Houston Litigation, and to allow the Insurer to continue advancing litigation costs and expenses with respect to the Fremak Arbitration and Houston Litigation.

39. Because the disputes and claims asserted in the Fremak Arbitration, the ISMT Award Appeal, and the Houston Litigation are intertwined and, essentially, offset each other, the Debtor requires that the litigations continue to their conclusion to properly liquidate all claims

for the benefit of the Debtor's creditors. Allowing those disputes to continue will ensure that all of the Debtor's creditors receive a fair and equitable recovery on their claims while protecting significant Debtor assets. Failure to lift the stay to permit these disputes to continue will harm the chances for the Debtor's creditors to receive their fullest recovery on their claims.

40.     Further, granting the motion will not prejudice the Debtor's creditors and other parties in interest. For the Debtor and the other litigants, granting the motion will place them in the same prepetition position: continuing the ISMT Award Appeal, the Fremak Arbitration, and the Houston Litigation to close. For the Debtor's creditors, they benefit because resolution of the disputes will likely result in a favorable recovery and there will be no depletion of estate assets because the Insurer is paying litigation costs.

B.     Retention Applications.

41.     The Debtor seeks to retain three professional firms to provide necessary services to the Debtor during the chapter 11 case.

42.     First, the Debtor is filing an application to Polsinelli PC ("**Polsinelli**") as its bankruptcy counsel. Polsinelli has the experience and knowledge concerning chapter 11 debtor representations and creditor rights to assist the Debtor in this chapter 11 case.

43.     Second, the Debtor is filing an application to retain Davis, Graber, Plotzker & Ward LLP ("**DGPW**") as its accountant and tax advisor. DGPW was the Debtor's prepetition accountant and tax advisor, and is well qualified and positioned to provide these services to the Debtor.

44.     Third, the Debtor is filing an application to retain Martin, Disiere, Jefferson & Wisdom, LLP ("**Martin Disiere**") as its special litigation counsel. Martin Disiere was the Debtor's prepetition counsel in the Houston Litigation, the ISMT Arbitration, and the Fremak

Arbitration. The Debtor desires to have Martin Disiere continue providing its services to the Debtor in those disputes. Further, Martin Disiere is and shall be compensated by the Insurer.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  July 1, 2015                              */s/ Leon Goldenberg*
        New York, New York                   Name: Leon Goldenberg
                                             Title: President